¶ 1. Harriet Cantrell brought suit against James Green, M.D. and Meridian Orthopaedic Clinic (MOC) in the Circuit Court of Lauderdale County, alleging that her post-operative care following her hip replacement surgery fell below the standard of care. As a result, Cantrell alleged that MOC and Dr. Green's substandard care was the proximate cause of her fixed abduction contracture (FAC), leaving her with significant pain and a limp. At the December 6, 2005, trial on the matter, after the close of Cantrell's case-in-chief, MOC and Dr. Green moved for a directed verdict and the motion was granted. Aggrieved, Cantrell asks this Court to determine whether the circuit court erred in granting MOC and Dr. Green's motion for directed verdict. Finding the decision of the circuit court erroneous, we reverse and remand this case for a new trial.
 FACTS ¶ 2. Cantrell developed avascular necrosis or "bone death" in her right hip as a result of continued regular injections of the steroid prednisone, used to treat her blood disease idiopathic thrombocytopenia. Cantrell consulted with Dr. Green to perform hip replacement surgery and the surgery was performed on May 9, 2000. Thereafter, Cantrell remained in the hospital and received inpatient physical therapy for approximately six days until her discharge.
 ¶ 3. At trial, testimony was offered during Cantrell's case-in-chief from Cantrell, herself, Cantrell's father, and Dr. Roger Dee, an expert retained by Cantrell. Dr. Green was also called as an adverse witness, and testified regarding his care. Several exhibits were also introduced during Cantrell's case-in-chief. The testimony and evidence offered at trial adduced that during her post-operative care, Dr. Green prescribed in-home physical therapy provided by Sta-Home Health Agency that was to continue until June 16, 2000. On May 17, 2000, Cantrell began her in-home physical therapy with physical therapist, David Pettigrew. Over the course of her physical therapy sessions, Pedigrew observed what he considered to be a substantial leg length disparity (LLD) between Cantrell's left and right leg. Pedigrew measured the LLD with a ruler and noted that Cantrell's right leg was approximately one and one-half inch longer than her left leg. According to Cantrell, Pedigrew then notified Dr. Green of the suspected LLD. On June 5, 2000, Dr. Green compared preand post-operative x-rays of Cantrell's right leg and confirmed the suspected LLD. However, Dr. Green determined that the LLD was only 1.5 centimeters, as opposed to the therapist's measurement of one and one-half inch, and opined that such a discrepancy was acceptable. Cantrell testified that Dr. Green did not advise her that LLD was a possible result of the surgery.
 ¶ 4. On June 6, 2000, Dr. Green ordered a hold on Cantrell's physical therapy because she had "progressed well" and he determined that full weight-bearing walking would be the only further therapy required. Dr. Green next saw Cantrell, at her request, on June 20, 2000. Again, Cantrell complained of the LLD. Dr. Green assessed Cantrell's LLD by having her stand up with both feet level on the ground. Cantrell testified that when she *Page 1004 
stood with her right foot flat on the ground, her left foot did not reach the ground. Cantrell testified that during this June 20, 2000 visit, Dr. Green stated that the LLD was caused by a pelvic obliquity or tilt caused by the tightening of the abductor muscles as a result of compensating for the LLD and that it would resolve itself over time through full weight-bearing exercise. However, Dr. Green did not note any FAC deformity during this visit.
 ¶ 5. Dr. Green discharged Cantrell from physical therapy on June 27, 2000, at which time the Sta-Home Health Agency nurses noted that the abduction (movement away from the body's midline) and adduction (movement towards the body's midline) of her right leg was within normal functional limits. Unsatisfied, Cantrell sought treatment from Gregory Terral, M.D. at Capital Orthopaedic Clinic in Jackson on October 20, 2000. Dr. Terral examined Cantrell noting that her right hip had an "excellent range of motion" and that it was "properly positioned and sized." Dr. Terral agreed with Dr. Green's assessment that the LLD was approximately 1.5 centimeters, and he noted no FAC deformity. Cantrell then went to a third orthopaedist, T. Buggs, Jr., M.D., in Birmingham, Alabama. Dr. Buggs confirmed a 1.5 centimeter LLD and prescribed a prosthetic shoe lift. Dr. Buggs did not note any FAC deformity.
 ¶ 6. After consulting with a lawyer, Cantrell was examined by Roger Dee, M.D., a professor of orthopaedics at New York University, Stonybrook, on May 27, 2003, more than three years post-surgery. Dr. Dee has performed more than 2,000 hip replacement surgeries in his career and is considered a pioneer in the field. Dr. Dee examined Cantrell by palpitating her hip while she was lying supine on the examining table and determined that she had a thirty-degree FAC deformity of the right hip. At trial, Dr. Dee testified that an FAC occurs when the abductor muscle running along the side of the hip is not properly stretched through post-surgery physical therapy and becomes fixed in the contracted position. Ultimately, Dr. Dee testified at trial that an FAC would be obvious to any orthopaedist. Dr. Dee further testified that if the condition was present when Cantrell last visited Dr. Green on June 20, 2000, then Dr. Green's post-operative care, or more specifically the discontinuation of Cantrell's physical therapy on June 6, 2000, would be a breach of the standard of care.
 STANDARD OF REVIEW ¶ 7. We are to conduct a de novo review of a trial court's grant or denial of a motion for directed verdict. Morgan v.Greenwaldt, 786 So.2d 1037, 1041-1042 (¶ 10) (Miss. 2001). "In reviewing a motion for a directed verdict [an appellate court] must decide whether the facts presented, together with any reasonable inferences, considered in the light most favorable to the nonmoving party, point so overwhelmingly in favor of the movant that reasonable jurors could not have returned a verdict for the plaintiff." Robley v. BlueCross/Blue Shield, 935 So.2d 990, 996 (¶ 16) (Miss. 2006). If such an issue has been presented to the jury that creates a question of fact, the motion should not be granted. Morgan, 786 So.2d at 1041-1042 (¶ 10).
 DISCUSSION ¶ 8. In order to establish a prima facie case of medical negligence in a case such as this, a plaintiff has to produce substantial evidence of (1) the existence of a physician-patient relationship, (2) expert testimony as to the relevant professional standard of care, (3) expert testimony that the physician's conduct fell below the relevant *Page 1005 
standard of care, (4) an injury to the plaintiff resulting from the physician's breach of the standard of care, and (5) damages.Cheeks v. Bio-Medical Applications, Inc.,908 So.2d 117, 120 (¶ 8) (Miss. 2005). "It is our general rule that in a medical malpractice action negligence cannot be established without medical testimony that the defendant failed to use ordinary skill and care." Id. (quoting Brooks v.Roberts, 882 So.2d 229, 232 (Miss. 2004)).
 ¶ 9. MOC's and Dr. Green's motion for a directed verdict was granted because the trial court found that Cantrell presented no evidence in her case-in-chief substantiating that substandard post-operative care caused a thirty-degree FAC deformity existing on June 20, 2000, or even that such a deformity existed at the time of trial. The trial court further found that since her own expert testified that if the FAC deformity did not exist when Dr. Green last examined Cantrell then Dr. Green's course of treatment did not fall below the standard of care. Further, the circuit judge found that no such FAC condition existed at the time of trial because Cantrell demonstrated for the court at trial that she could abduct her leg away from her body's midline.
 ¶ 10. During Cantrell's case-in-chief, testimony was provided by Cantrell's medical expert, Dr. Dee. Dr. Dee testified that although the two-centimeter LLD did not cause Cantrell's FAC deformity, the failure of Dr. Green to communicate and instruct the physical therapist and the subsequent discontinuation of physical therapy after Cantrell's surgery caused the FAC. In Dr. Dee's opinion, Dr. Green should have identified the FAC deformity. Dr. Dee opined that if Dr. Green had identified the FAC problem during Cantrell's post-operative care, that the condition could have been resolved or eliminated by ordering physical therapy to stretch Cantrell's muscle. Dr. Dee further testified that in his medical opinion, on June 20, 2000, Cantrell should have received targeted, specialized medical and physical therapy treatment to correct her FAC deformity.
 ¶ 11. As to the issue of whether Cantrell provided any evidence regarding the existence of the FAC continued until the time of trial, we point out that Cantrell performed a demonstration at trial showing that when she stood with her right foot flat on the floor, her left foot could not touch the ground. In order to stand with both feet on the ground, Cantrell had to bend her right knee and tilt her pelvis.
 ¶ 12. In light of the testimony presented by Dr. Dee and Cantrell's in-court demonstration, we find that several facts in this case were in dispute. While Dr. Green testified that the FAC condition was not present during Cantrell's June 20, 2000 visit, Dr. Dee testified that on June 20, 2000, Dr. Green should have ordered targeted physical therapy to correct Cantrell's FAC condition. This conflict in the existence of a FAC deformity on June 20, 2000, is a quintessential example of a material issue of fact to be resolved by the jury. Considering the evidence presented during Cantrell's case-in-chief, we find that a reasonable jury could have returned a verdict in favor of Cantrell. Whether or not the FAC as demonstrated by Cantrell existed on June 20, 2000, essentially boils down to a "battle of the experts," through which the jury must determine the victor. The circuit court erred in granting MOC's and Dr. Green's motion for directed verdict. Therefore, we reverse the judgment of the Lauderdale County Circuit Court and remand this case for a new trial.
 ¶ 13. THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUITCOURT IS REVERSED AND REMANDED FOR A NEW TRIAL. ALL *Page 1006 COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
KING, C.J., LEE, P.J., IRVING AND ISHEE, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER AND BARNES, JJ. GRIFFIS AND ROBERTS, JJ., NOT PARTICIPATING.